IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLAS PAUL MELIA, | ) | Case No. 1:22-CV-0276 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| KILOL KIJAKAZI, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Nicolas Paul Melia, seeks judicial review of the final decision of the

Commissioner of Social Security, denying his applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act. Melia challenges the Social Security Administration's ("SSA") structure, contending that it

violates separation of powers principles because, under 42 U.S.C. § 902(a)(3), the Commissioner

does not serve at the pleasure of the president. Melia additionally challenges the Administrative

Law Judge's ("ALJ") negative findings, arguing that the ALJ erred in evaluating his subjective

symptom complaints and in evaluating both Dr. Samer Alamir's and the state agency

psychiatrists' medical opinions.

Melia lacks standing to contest the constitutionality of the ALJ's decision based on the

president's removal authority. And because the ALJ applied proper legal standards and reached

a decision supported by substantial evidence, I recommend that the Commissioner's final

decision denying Melia's applications for DIB and SSI be affirmed.

## I.    Procedural History

Melia applied for DIB on December 17, 2019 and for SSI on January 2, 2020.  (Tr. 189,

199).  Melia alleged that he became disabled on June 8, 2018, due to: (i) trigeminal neuralgia,

(ii) lingual nerve damage, (iii) inferior alveolar nerve damage, (iv) chronic anxiety disorder, and

(v) chronic depressive disorder.  (Tr. 227, 231).  The SSA denied Melia's claim initially and

upon reconsideration.  (Tr. 78-85, 96-104).

On December 11, 2020, ALJ William Leland heard Melia's case and denied his

application in a December 23, 2020 decision.  (Tr. 13-25, 30-76).  At Step Four of the sequential

evaluation process, the ALJ determined that Melia had the residual functional capacity ("RFC")

to perform work at a medium exertional level, except that:

> [Melia] can frequently climb ladders, ropes, or scaffolds.  [Melia] can never be
> exposed to unprotected heights, moving mechanical parts, or operate a motor
> vehicle.  [Melia] is limited to performing simple, routine, and repetitive tasks, but
> not at a production rate pace (*i.e.* assembly line work).  [Melia] is limited to
> simple work-related decisions in using his judgment and dealing with changes in
> the work setting.  [Melia] is able to occasionally interact with supervisors and
> coworkers, but never interact with the public.

(Tr. 17-18).  Based on vocational expert ("VE") testimony that an individual with Melia's age,

experience, and RFC could work as a janitor, packager, or kitchen helper, the ALJ determined

that Melia was not disabled.  (Tr. 24).  On December 29, 2021, the Appeals Council denied

further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

On February 21, 2022, Melia filed a complaint to obtain judicial review.[1]

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Melia was born on November 10, 1989 and was 28 years old on the alleged onset date. (Tr. 227).  He completed college in 2015 and had prior experience as a software engineer at various companies, which the ALJ determined he could not perform.  (Tr. 23, 232).

### B.     Relevant Medical Evidence

In order to provide a full understanding of Melia's functional capabilities, I will provide some additional history as to the development of his medical conditions.

On June 1, 2017, Melia saw Dr. Samer Alamir for a psychiatric evaluation, complaining of depression, anxiety, and panic attacks.  (Tr. 330, 333).  Melia reported that he started having anxiety when he was 17 years old and had panic attacks when he saw his dentist to have a crown redone.  (Tr. 330).  The procedure, however, caused nerve damage and caused Melia to have strange sensations in his mouth, which led to panic attacks and anxiety.  *Id.*  Melia indicated that he had panic attacks and symptoms daily, which involved "acute onset of a discrete period of intense fear or discomfort."  *Id.*  He also reported sweating, shortness of breath, increased heart rate, trembling or shaking, nausea or abdominal distress, parathesis, a choking sensation, and fear of losing control.  *Id.*  Dr. Alamir estimated the severity of Melia's condition to be "high" and noted that Melia's panic attacks could "last for hours."  *Id.*

Further, Melia described having generalized anxiety, which Dr. Alamir characterized as generalized anxiety disorder ("GAD"), noting he became easily fatigued and had feelings of impending doom and restlessness; difficulty relaxing, concentrating, and sleeping; excess muscle tension; irritability; and excessive worrying.  *Id.*  Melia also noted a history of depression, accompanied by the following symptoms: sadness, loss of enjoyment, fatigue, loss of energy,

3

difficulty sleeping and concentrating, decreased appetite and sociability, increased worrying, interference with daily functioning, and irritability. (Tr. 331). Melia denied any suicidal ideations or intentions. *Id.* A review of Melia's systems was, generally, normal except for left facial pain with burning and pressure in his mouth; Dr. Alamir noted Melia had about 25% numbness in his face and his tongue burned. (Tr. 332).

Dr. Alamir observed that Melia appeared flat, sad looking, irritable, attentive, communicative, casually groomed, overweight, and unhappy. (Tr. 333). Melia had normal speech, a sad demeanor, a constricted affect, intact and logical associations, logical thinking, appropriate thought content, intact and appropriate cognitive functioning and fund of knowledge, and intact memory and ability to abstract. *Id.* Melia was also fully oriented with fair insight and judgment. *Id.* Dr. Alamir diagnosed Melia with a panic disorder, GAD, and an unspecified mood disorder. *Id.* He started Melia on medications. *Id.*

From June 15, 2017 to May 7, 2018, Melia continued to see Dr. Alamir or his physician assistant, Sara Lemmon, PA-C. (*See* Tr. 321-329). Initially, Dr. Alamir observed that Melia did not reveal any serious mental status abnormalities; his appearance, dress, and grooming were all appropriate and he did not exhibit depression or mood elevation. (Tr. 329). Dr. Alamir also noted that Melia had normal speech, intact associations, "basically logical" thinking, appropriate thought content, intact judgment and insight, a normal attention span, and mild signs of anxiety. *Id.* Generally, Melia reported improvement with both his depression and nerve damage, although his underlying symptoms persisted and interfered with his functioning. *Id.* Dr. Alamir's observations were generally the same, but, after the initial visit, usually noted that Melia appeared anxious, had signs of mild depression, a sad demeanor, and excessive worry.

(Tr. 321-327).  Throughout the appointments, Melia's diagnoses did not change, and only minor adjustments were made to his medications.  (*See* Tr. 321-329).

On August 7, 2018, Melia saw Lemmon, reporting that he was doing "okay," but that his nerve pain worsened.  (Tr. 320).  He reported that he struggled with his weight because eating seemed to help with the pain, and he quit his job because he struggled to function and focus on his work.  *Id.*  He felt better since quitting, his anxiety had been good, and he had not had any recent panic attacks.  *Id.*  Lemmon observed that Melia presented as friendly, sad looking, attentive, communicative, causally groomed, overweight, and unhappy.  *Id.*  He had normal speech, a depressed mood, a constricted affect, intact and logical associations, logical thinking, appropriate thought content, and fair insight and judgment.  *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued Melia's medications, increasing his Lexapro dosage.  *Id.*

On November 2, 2018, Melia saw Lemmon, reporting that he had been in a lot of pain recently and that the higher Lexapro dosage made him nauseous and "airy" in his head, so he had reduced it.  (Tr. 319).  He also indicated that he had less anxiety, no recent panic attacks, and was in a fair mood.  *Id.*  Lemmon observed that Melia was friendly, attentive, communicative, casually groomed, and overweight, but appeared unhappy.  *Id.*  He had normal speech, a sad demeanor, a depressed mood, a constricted affect, intact and logical associations, logical thinking, appropriate thought content, and fair insights and judgment.  *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued Melia's medications, decreasing his Lexapro dosage.  *Id.*

On January 25, 2019, Melia saw Lemmon.  (Tr. 317).  On a patient health questionnaire, he indicated that in the last two weeks, he had several days when he had little interest in doing things, trouble falling/staying asleep or sleeping too much, felt tired or had little energy, had a poor appetite or overate, and noticeably moved slowly or fidgeted.  (Tr. 318).  He noted that

5

more than half of the days he felt down, depressed, or hopeless; felt bad about himself; and had trouble concentrating.  *Id.*

Melia further reported that he was getting better but had flare-ups which sometimes disrupted him at his new job.  (Tr. 317).  Lemmon observed that Melia was friendly, attentive, communicative, casually groomed, overweight, and appeared unhappy.  *Id.*  He had normal speech, a sad demeanor, a depressed mood, a constricted affect, intact and logical associations, logical thinking, appropriate thought content, a short attention span, and fair insight and judgment.  *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued Melia's medications, increasing his Klonopin dosage for his anxiety.  *Id.*

On April 22, 2019, Melia saw Lemmon and completed a patient health questionnaire. (Tr. 315-316).  He indicated that nearly every day, over the preceding two weeks, he had felt bad about himself.  (Tr. 316).  During that same period, on more than half the days he felt down, depressed, or hopeless; had trouble falling/staying asleep or sleeping too much; and felt tired or had little energy, and on several days he had little interest in doing things, a poor appetite or overate, and trouble concentrating.  *Id.*  He never felt like he was noticeably moving slowly or fidgeting or that he would be better off dead or hurting himself.  *Id.*  These issues made it somewhat difficult for him to work, take care of things at home, or get along with other people. *Id.*

Melia reported to Lemmon that his pain was flaring up, but he was doing better with the increased Klonopin dosage, noting his flare-ups were not significant.  (Tr. 315).  He reported that he still had depression about his nerve pain but was trying to adjust to it and he was still working. *Id.*  Lemmon observed that Melia did not show any serious mental status abnormalities; his appearance, dress, and grooming were unremarkable; and his mood was mildly depressed.  *Id.*

She noted that he was fully oriented, and had normal speech; appropriate behavior; logical thinking; appropriate thought content; and intact memory, associations, judgment, and insight. *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued Melia's medication.  *Id.*

On July 17, 2019, Melia saw Lemmon and completed a patient health questionnaire. (Tr. 312-314).  Over the preceding two weeks, he indicated that nearly every day, he had trouble falling/staying asleep or sleeping too much and felt bad about himself.  (Tr. 314).  More than half of the days during that period, he had little interest in doing things; felt down, depressed, or hopeless; felt tired or had little energy; and had trouble concentrating.  *Id.*  And on several days, he felt that he noticeably moved slowly or fidgeted, and he had thoughts that he would be better off dead or hurting himself.  *Id.*  He did not have a poor appetite or overeat.  *Id.*  These issues made it very difficult for him to work, take care of things at home, or get along with others.  *Id.*

Melia reported to Lemmon that he had been doing okay and he was trying to cope with his nerve damage.  (Tr. 312).  He was working on his weight, which helped with his nerve pain, and had reduced his Lexapro dosage.  *Id.*  He reported that his mood was stable and manageable, and his anxiety was well controlled.  *Id.*  He believed most of his depression symptoms were due to his nerve pain.  *Id.*  Lemmon observed that Melia was friendly, distracted, communicative, casually groomed, overweight, and looked unhappy.  *Id.*  He had normal speech, a sad demeanor, a depressed mood, a constricted affect, intact and logical associations, logical thinking, appropriate thought content, fair insight and judgment, and a short attention span.  *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued Melia's medication, adjusting his Lexapro.  *Id.*

On October 8, 2019, Melia saw Lemmon and completed a patient health questionnaire. (Tr. 309-311).  He estimated that, over the preceding two weeks, he felt generally the same as before.  However, he felt bad about himself, felt tired or had little energy, and had trouble

concentrating on only several days during that period, rather than every day or half the days. (Tr. 311).  He also did not have any thoughts that he would be better off dead or hurting himself. *Id.*  His feelings did, however, make it somewhat difficult for him to function.  *Id.*

Melia reported to Lemmon that he was doing about the same and his pain prevented him from working and functioning normally.  (Tr. 309).  He indicated his pain affected his sleep and caused ringing in his ears and a burning sensation in his face.  *Id.*  He reported that his anxiety was well controlled.  *Id.*  Lemmon observed that Melia presented as friendly, sad looking, attentive, communicative, casually groomed, overweight, and appeared unhappy.  *Id.*  He had normal speech, a sad demeanor, a depressed mood, a constricted affect, intact and logical associations, logical thinking, appropriate thought content, and intact insight and judgment.  *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued his medications but added an additional medication for Melia's insomnia.  (Tr. 309-310).

On January 3, 2020, Melia saw Lemmon and completed a patient health questionnaire. (Tr. 306-308).  Melia's report was, generally, the same as before.  However, he indicated that he felt bad about himself nearly every day during the two-week period; had little interest in things; felt down, depressed, or hopeless, and had trouble falling/staying asleep or sleeping too much more than half the days; and felt tired, had little energy, and noticeably moved slowly or fidgeted several days.  (Tr. 308).  These conditions made it very difficult for him to work, take care of things at home, and get along with others.  *Id.*

Melia reported to Lemmon that he was struggling daily with his facial pain, and it was distracting and inhibiting his functioning.  (Tr. 306).  He also reported that his sleep had improved, and his pain was better with the increased Neurontin dosage.  *Id.*  Lemmon indicated that his mood was down and depressed and he lost interest in things.  *Id.*  Lemmon observed that

Melia presented as friendly, attentive, communicative, casually groomed, overweight, and looked unhappy. *Id.* She also noted that he had normal speech, a sad demeanor, depressed mood, constricted affect, intact and logical associations, logical thinking, appropriate thought content, fair insight and judgment, and a short attention span. *Id.* Lemmon maintained Dr. Alamir's diagnoses and continued his medication. (Tr. 306-307).

On January 7, 2020, Melia saw Harold Goforth, M.D., complaining of headaches. (Tr. 338, 341). Melia explained his history of facial pain, as well as tinnitus and left ear pain. (Tr. 339). A review of his systems was, generally, normal except for his depression, anxiety, and facial pain. (Tr. 340). On physical examination, Melia was also normal, except for certain cranial nerves where he reported hyperesthesia. *Id.* Melia and Goforth discussed his pain and concerns Goforth had over Melia's management of it, including his need to have a brain MRI due to the severity of his trigeminal pain to exclude a nerve injury. *Id.*

On January 20, 2020, Melia saw Jijun Xu, M.D., Ph.D., a pain management specialist for his facial pain. (Tr. 335-336, 338). Melia reported that his pain had started about two years prior when he underwent a root canal and he now had left-ear pain and numbness, and his pain worsened with a lack of sleep and warm temperatures. (Tr. 336). In a review of his systems, Melia was normal. (Tr. 337). Dr. Xu observed that Melia was not in acute distress, was appropriate in mood and affect, and was otherwise normal. *Id.* Dr. Xu noted that Melia's pain was inconsistent with trigeminal neuralgia, because he had a large component of numbness as opposed to "frank" pain. *Id.* Dr. Xu recommended that he attempt to place a TENS unit on Melia's face and provided him with Voltaren Gen. *Id.*

On February 24, 2020, Melia saw Dr. Xu for a follow-up on his facial pain. (Tr. 346). He indicated that his pain was affecting his left forehead, maxilla, and mandible, and was

9

burning, numbing, and tingling.  *Id.*  A review of his systems was normal, and, on physical examination, Dr. Xu observed that Melia was not in acute distress, had an appropriate mood and affect, and was otherwise normal.  (Tr. 347-348).  Melia reported that the TENS unit had mitigated his symptoms for "only a short period of time" and the gel caused a skin irritation.  *Id.*  They discussed a left trigeminal nerve block.  (Tr. 348-349).

On March 20, 2020, Melia underwent an MRI, which made no acute findings. (Tr. 345-346, 350-351).

On March 23, 2020, Melia saw Lemmon, reporting that he was doing okay and was about the same as his last visit.  (Tr. 412-413).  He reported that his facial pain disrupted his concentration and sleep, Trazodone helped with his pain, his anxiety was manageable, and he had been offered different procedures to potentially help with his pain, but he was unsure about them.  (Tr. 412).  He also indicated that Neurontin and Klonopin helped with his pain, that his depression was the same, and noted that he experienced loss of interest, low energy, and feelings of worthlessness.  *Id.*  Lemmon observed that Melia was fully oriented and had a moderately depressed mood; normal speech; no apparent thought disorder; logical thinking; appropriate thought content; and intact associations, cognitive functioning, insight, and social judgment.  *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued Melia's medications.  (Tr. 412-413).

On June 25, 2020, Melia saw Lemmon for a telepsychiatry session.  (Tr. 410-411).  Melia reported that he had started feeling better and doing more.  (Tr. 410).  He still struggled with his facial nerve damage, but he was managing with his medications and felt that they helped.  *Id.*  Lemmon observed that Melia was fully oriented, relaxed, attentive, and communicative.  *Id.*  She also noted that he had a depressed mood; normal speech; logical thinking; appropriate thought

10

content; and intact cognitive functioning, associations, insight, and social judgment.  *Id.*  She maintained Dr. Alamir's diagnoses and continued Melia's medications.  (Tr. 410-411).

On September 16, 2020, Melia saw Lemmon for a telepsychiatry session.  (Tr. 486).  He reported that he was doing good and was stable.  *Id.*  He noted that he was in a master's degree program, which caused stress, but he was coping well.  *Id.*  He also reported that he was having grogginess in the morning from Trazodone and felt tired during the day, but his medications were helping with his nerve damage, and he did not have feelings of anxiety or depressive symptoms.  *Id.*  Melia noted that his sister had started Remeron, and he was interested in trying it.  *Id.*  Lemmon observed that Melia did not have any serious mental status abnormalities and was fully oriented.  *Id.*  She noted that he did not exhibit depression or mood elevation, and he had normal speech, appropriate behavior, no signs of cognitive difficulty, a normal attention span, and intact memory, judgment, and insight.  *Id.*  Lemmon maintained Dr. Alamir's diagnoses and continued Melia's medication, adding Remeron for his anxiety.  (Tr. 486-487).

On December 10, 2020, Melia had a telepsychiatry session with Lemmon.  (Tr. 490).  Melia reported that he was doing poorly, noting he ran out of Klonopin, was not sleeping well, had reduced his Lexapro dosage for the prior two months, and felt more down and depressed.  *Id.*  He indicated that he had anergic behavior; anhedonia; difficulty concentration; excessive worrying and fatigue; feeling of guilt, hopelessness, and worthlessness; memory difficulties; sadness; decreased sociability; and poor motivation.  *Id.*  He felt that Lexapro had "run its course" and wanted to try something else.  *Id.*  Lemmon observed that Melia had a moderately depressed mood, but he was fully oriented, relaxed, attentive, and communicative.  *Id.*  She noted that Melia had normal speech; logical thinking; appropriate thought content; a short attention

11

span; and intact associations, cognitive functioning, insight, and judgment.  *Id.*  Lemmon

maintained Dr. Alamir's diagnoses and continued his medication, adding Prozac.  (Tr. 490-491).

### C.    Relevant Opinion Evidence

#### i.    Mental Impairment Questionnaire – Samer Alamir, M.D., and Sara Lemmon, PA-C

Dr. Alamir and Lemmon completed an undated mental impairment questionnaire

concerning Melia[2].  (Tr. 488-489).  They noted the conditions they had diagnosed Melia with, his

prescribed medications, and that Melia experienced side-effects of lethargy, fatigue, drowsiness,

and gastrointestinal issues.  (Tr. 488).  They indicated that his prognosis was "poor – fair."  *Id.*

And that Melia's ability to have sustained concentration and persistence did not meet

competitive standards in every category measured, identifying that he particularly had no useful

ability to complete a normal workday and workweek without interruptions from psychologically

based symptoms.  (Tr. 488-489).  He also was unable to meet competitive standards in his ability

to understand and remember things or in his social interactions.  (Tr. 489).  Regarding adaptation

limitations, they found that Melia had no useful ability to function in responding to changes in

the work setting or in setting realistic goals and making plans independently of others; and they

opined that he was unable to meet competitive standards in his ability to be aware of normal

hazards and taking appropriate precautions.  *Id.*  They estimated that Melia's impairments would

cause him to be absent from work 2 to 3 days per week and would cause him to be off task for

the entire workday.  *Id.*

---

[2] Although the report is undated, the questionnaire bears a fax confirmation legend indicating it was
transmitted on December 7, 2020.

### ii. Function Report – Nicholas Melia

On July 4, 2020, Melia completed a function report, describing the impact his conditions had on his daily functioning.  (Tr. 246-253).  He explained that his conditions limited his ability to work because they disrupted his sleep and caused him to not think clearly or focus, take breaks due to facial pain, and experience mood fluctuations, anxiety, despair, and depression. (Tr. 246-247).  He described his day as staying in bed due to insomnia, doing short-term physical activities that caused hourly flare-ups, eating small meals, and watching television or other media.  (Tr. 247).  He watched one of his children a few days a week, but his children's mother and grandparents did all of the other child-related tasks.  *Id.*  Prior to his injury, he was able to sleep normally, drive, think clearly, work, and have hobbies.  *Id.*  He could care for his personal needs, but showering caused flare-ups in his pain due to the temperature changes and shaving, brushing his teeth; and exertion caused pain and/or flare-ups.  *Id.*  He needed reminders to brush his teeth, shower, and eat, but not to take his medicine.  (Tr. 248).

Melia explained that he could make his own small meals that did not require time or exertion.  *Id.*  He could also only do minor chores around the house, such as cleaning dinner plates, and needed encouragement to start such tasks.  *Id.*  He did not do any house or yard work because the labor would cause a flare-up with his pain.  (Tr. 249).  Melia would go outside about twice a week for short periods; he could walk or ride in a car and could go out alone but did not drive due to the safety concerns of what might happen if he had a sudden onset of pain.  *Id.*  He could handle his own money and would do small amounts of shopping in stores (about 20 minutes once a week) and would also shop online.  *Id.*

Melia reported that his hobbies included listening to music, watching television, and playing easy board games, and he did these as often as his pain permitted.  (Tr. 250).  His

injuries limited his abilities, however, because of a loss of focus and interest and inability to exert himself.  *Id.*  He would spend time talking to family and friends daily, but he did not go anywhere regularly.  *Id.*  He would need to be reminded to go to doctors' appointments and his parents would take him.  *Id.*  Although Melia did not have problems getting along with others, he no longer had as much of an emotional connection with others.  (Tr. 251).

Melia indicated that his conditions affected his ability to lift, squat, bend, stand, walk, sit, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, understand, and follow instructions.  *Id.*  He noted that any type of exertion caused a flare-up in his pain.  *Id.*  He reported that he could walk but was in pain and would need to wait one hour for flare-ups to end. *Id.*  He could pay attention for 5 to 10 minutes, did not finish what he started, and could follow written instructions decently, depending on the length of the tasks, but not spoken instructions. *Id.*  He got along with authority figures but did not handle stress or changes in his routine well. (Tr. 252).  He noted that he also had anxiety in public and with doctors, out of a fear of being hurt.  *Id.*  Melia reported side-effects from his medication, including that Klonopin and Gabapentin cause him cognitive issues and tiredness, Trazodone caused him nausea, and Tylenol/Advil caused him an upset stomach.  (Tr. 253).  He indicated that trigeminal neuralgia and nerve damage, both of which he had, "has created some of what I believe [to be] the most detrimental, depressive, painful injur[ie]s on earth."  *Id.*

### iii.  Third-Party Function Report – Jenna Colucci, Fiancé

On November 13, 2020, Jenna Colucci, Melia's fiancé, completed a function report on how his conditions impacted his daily life.  (Tr. 280-287).  She indicated that they spent every day together and that Melia "does not function like a normal person."  (Tr. 280).  She noted that he barely left his room, any heavy labor caused the nerve damage in his face to flare-up, he had

trouble sleeping, and he could not concentrate due to the "constant agonizing facial burning and spasms in his tongue."  *Id.*  As to his daily activities, Colucci stated that Melia, generally, did not do anything and only left his bedroom to use the restroom or shower.  (Tr. 281).  She indicated that he did not take care of anyone else, and she had relied on her parents, Melia's parents, and a tutor to help with the children.  *Id.*  Prior to his injury, Colucci described Melia as being motivated and successful, and working full time as a software engineer.  *Id.*  He would also help around the house, go places, and take care of himself and the children.  *Id.*  She indicated that Melia had trouble falling asleep due to the facial pain and ringing in his ears, which could cause him to stay up all night, "pass out" from exhaustion, and sleep all day.  *Id.*  She also indicated that Melia would wear the same clothes for days at a time, rarely showered, and needed to be reminded to shower, brush his teeth, do his hair, shave, and change his clothes.  (Tr. 281-282).  He did not need reminders to take his medication.  (Tr. 282).

Colucci indicated that Melia would only prepare sandwiches for himself but otherwise would not cook and would not eat unless she cooked.  *Id.*  She indicated he prepared meals for himself 2 to 3 times a week but, before his injury, he enjoyed cooking and would make dinner most nights.  *Id.*  She also indicated that Melia did not do household chores, except for occasionally cleaning his room and he needed verbal motivation to do so.  *Id.*  She explained that he did not do house or yard work because he was "incredibly depressed due to pain," was unable to concentrate on tasks, and had "no enjoyment in his life or in caring for his home . . ." (Tr. 283).  Melia went outside a couple of times a week, could drive and ride in a car, and could go out alone.  *Id.*  He would do quick trips to stores and shop online.  *Id.*  Colucci also noted that Melia had trouble handling finances, as he became erratic with his money and accumulated debt; did not maintain a savings account; and did not have a check book.  (Tr. 283-284).

15

Colucci reported that Melia would watch television daily and fish about three to four times a month. (Tr. 284). Melia did not spend time with anyone other than her and his family, rarely talking to anyone on the phone. *Id.* She indicated he would go to the grocery store and could do so alone, but would be accompanied to his doctors' appointments by his parents. *Id.* His relationship with his family had also deteriorated; Melia was no longer social and "shut himself off from the world." (Tr. 285). Colucci reported that Melia's condition affected his ability to lift, walk, talk, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. *Id.* She noted that how far Melia could walk depended on the day and that, it was the "emotional overlay" from his pain that really inhibited his abilities. *Id.* He could not pay attention for long and had attention deficit hyperactivity disorder. *Id.* He did not follow written instructions well because he would forget whatever he read and could not concentrate long enough to follow spoken instructions. *Id.* She indicated he was very averse to authority figures, did not handle stress well, and had no routine to handle changes too. (Tr. 286). Colucci explained that Melia had nightmares about his injury and the dentist who caused it, would go into a "blind range" when criticized, and had "no appreciation for life." *Id.* She indicated that his Klonopin caused memory loss, sleepiness, and agitation, and his Gabapentin caused a "cloudy brain" and inability to concentrate. (Tr. 287).

#### iv.  Third-Party Function Report – Kim Melia, Mother

On December 1, 2020, Kim Melia, Melia's mother, completed a function report on how his conditions impacted his daily functioning. (Tr. 288-295). She reported that Melia was in constant, chronic pain and would experience flare-ups. (Tr. 288). The pain, she indicated, was debilitating and affected his tongue, causing a burning sensation, facial and ear pain, and ringing in his ears. *Id.* She reported that Melia did not do much because of the pain, spending most of

16

the time in his room.  (Tr. 289).  He tried to take care of his family, but was limited by his pain

and depression; he also had a cat he fed.  *Id.*  She indicated she and the other grandparents helped

with his children and that his condition had changed his whole life, as it had prevented him from

working as a software engineer, providing for his family, and carrying for his children.  *Id.*

Melia's mother noted that his conditions impacted his ability to fall asleep, caused him to

sleep during the day, and resulted in depression.  *Id.*  He did not have any problems with his

personal care but needed reminders to take his medication.  (Tr. 289-290).  Melia could make

himself sandwiches when he was hungry, but he used to enjoy grilling.  (Tr. 290).  He hardly did

any housework and did not do yard work because of the pain and depression.  *Id.*  He needed

encouragement to do things and he had "lost his lust for life."  (Tr. 290-291).  He hardly went

outside due to the pain and depression.  (Tr. 291).  He would drive and ride in a car and could go

out alone.  *Id.*  He would do quick trips to the grocery store and shop online.  *Id.*

Melia's mother reported that he enjoyed fishing but did not do it often because of his pain

and depression.  (Tr. 292).  She indicated that Melia hardly ever spent time with others and did

not go anywhere.  *Id.*  He also needed to be reminded to go to places.  *Id.*  Melia had problems

getting along with others, stating that he "is angry a lot of the time" and that he did not socialize.

(Tr. 293).  His constant pain affected his ability to complete tasks, concentrate, and get along

with others.  *Id.*  He could follow written and spoken instructions fine.  *Id.*  He got along with

authority figures well, but he could not handle stress well.  (Tr. 294).  He could handle changes

in his routine, but she had noticed that he feared he would never get better.  *Id.*

17

### v.  State Agency Consultants

#### 1.  Physical Health Consultants

On April 1, 2020, Steve McKee, M.D., reviewed Melia's medical records to evaluate his physical limitations.  (Tr. 82-83).  He found that Melia was limited to occasionally lifting or carrying 50 pounds, frequently lift and/or carry 25 pounds, pushing and pulling with his extremities consistent with his lifting or carrying limitations, and could stand and/or walk for 6 hours in an 8-hour workday, sit for a total of 6 hours in an 8-hour workday, but was otherwise unlimited.  (Tr. 82).  On July 27, 2020, Mehr Siddiqui, M.D., reevaluated the medical record and possible resulting limitations, agreeing with Dr. McKee's findings.  (Tr. 100-101).

#### 2.  Mental Health Consultants

On March 10, 2020, Robyn Murry-Hoffman, Psy. D., reviewed Melia's medical records to evaluate his mental health limitations.  (Tr. 83-84).  She found that Melia did not have any limitations in his understanding and memory but did in the other three areas of mental health functioning.  (Tr. 83-84).  As to his ability to sustain concentration and persist, she found that he was moderately limited in his ability (i) to carry out detailed instructions; (ii) to maintain attention and concentration for extended periods; (iii) to performed activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (iv) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but was otherwise not significantly limited.  (Tr. 83).  She noted that he would be able to perform routine tasks in a solitary setting that did not require him to sustain close consistent attention to detail or fast-paced performance.  *Id.*

As to his social interactions, Dr. Murry-Hoffman found that Melia was moderate limited in his ability to interact appropriately with the general public but was otherwise not significantly limited. *Id.* Likewise, as to his adaption, Dr. Murry-Hoffman found that Melia was, generally, not significantly limited, but he was moderately limited in his ability to respond appropriately to changes in his work setting. (Tr. 84). On July 13, 2020, Irma Johnston, Psy. D., reevaluated the medical record and possible resulting limitations, agreeing with Dr. Murry-Hoffman's findings. (Tr. 101-103).

### D.    Relevant Testimonial Evidence

Melia testified at the hearing. (Tr. 41-63). He explained that he lived in his own home with his children and their mother. (Tr. 41-42). His weight drastically fluctuated due to inactivity and eating as a side-effect of his medication. (Tr. 43). He had a driver's license, but he did not drive because he could not afford car insurance. (Tr. 44). Typically, his girlfriend or his family would drive him, or he would walk to places he needed to go. *Id.* He completed a bachelor's degree and had signed up for an online master's degree program, but he was not doing well in the classes. (Tr. 44-45). He, generally, took one or two classes at a time. (Tr. 45-46). He had previously taken a class on corporate financial management and received an A and was currently in a digital marketing class and a financial decision making. (Tr. 46-47). He would, generally, spend about four and a half hours a week completing the classwork. (Tr. 48). He had previously worked for a software company through a temporary agency position but was fired because he could not complete the work due to the inability to concentrate caused by his nerve damage. (Tr. 48-50). He previously worked at Home Depot and as a software engineer with various companies. (Tr. 50-55).

Melia explained that he believed he could not work due to his facial nerve damage. (Tr. 55). The damage caused constant chronic pain and stabbing sensation in his face and a burning sensation on his tongue, which caused him difficulty concentrating. *Id.* He would experience flare-ups with temperature changes. *Id.* The pain, he explained, had converted into a mental illness and he would become angry with people. (Tr. 56). He felt hopeless and that the pain would not leave him. *Id.* Melia explained that he could take classes but not work because he could work at his school assignments at his own pace, but a work environment would not be as flexible. (Tr. 57-58). He would take a break from his schoolwork about every 15 minutes for about an hour. (Tr. 57). During the summer, he tried to go fishing about once a week. (Tr. 58-59). He did not think he would be able to care for his children without others' assistance. (Tr. 59). Melia explained that he would wash himself with a washcloth, but only showered once a week to avoid flare-ups, and that he usually wore the same clothes. *Id.* He had not been able to find anything to relieve his pain; his only alternative at the moment was a procedure to numb his face. (Tr. 58, 60). Melia explained that he had lost all motivation and his pain caused him to have ringing in his ears and trouble falling asleep. (Tr. 60-61).

## III.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d

at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means

– and means only – 'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the

court will not uphold that decision when the Commissioner failed to apply proper legal

standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own

regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of

a substantial right.").  And the court will not uphold a decision when the Commissioner's

reasoning does "not build an accurate and logical bridge between the evidence and the result."

*Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78

F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot

determine if it was discounted or merely overlooked.").

## B.      Separation of Powers

Melia argues that a remand is warranted because the SSA's statutory structure governing

the removal of the Commissioner is identical to that of the Consumer Financial Protection

Bureau ("CFPB"), which the Supreme Court held in *Seila Law LLC v. Consumer Fin. Prot.*

*Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*"), violated the principle of separation of

powers.  ECF Doc. 6 at 9.  Melia contends that Andrew Saul was unconstitutionally appointed

and lacked the authority to carry out his function as Commissioner, which adversely affected

Melia's proceedings because: (i) the ALJ necessarily lacked the authority to hear and decide the

matter; and (ii) the ALJ decided his case based on policies and regulations promulgated by a commissioner who lacked authority to act. ECF Doc. 6 at 10-11. And Melia argues that President Biden's remarks when he terminated former Commissioner Andrew Saul suggested the President disapproved of Saul's policy changes. ECF Doc. 6 at 11-12.

The Commissioner concedes that the SSA's statutory structure violates the separation of powers, but argues that the violation alone does not warrant remand. ECF Doc. 8 at 6. The Commissioner argues that, regardless of the separation of powers violation, a claimant must still demonstrate that the violation caused him harm and Melia has failed to make that showing. ECF Doc. 8 at 6-12. Additionally, the Commissioner contends that Melia's claim fails under the Harmless Error Doctrine, the De Facto Officer Doctrine, the Rule of Necessity, and for "broad prudential concerns." ECF Doc. 8 at 12-15.

In his reply brief, Melia largely reiterates his arguments and contends that those various doctrines and prudential reasons cited by the Commissioner do not mitigate the harm caused by his constitutionally insufficient process. *See* ECF Doc. 9 at 2-9.

In *Seila Law*, the Supreme Court reviewed the constitutionality of the CFPB's removal structure, which limited the president's authority to remove the CFPB Director only to instances of "inefficiency, neglect of duty, or malfeasance of office." 140 S. Ct. at 2192–93; 12 U.S.C. § 5491(c)(3). The Court held that the limitation on the president's removal authority over a federal executive branch agency's single director violated the principle of separation of powers. 140 S. Ct. at 2192, 2197, 2211. Not long after, *Collins* applied *Seila Law* to the Federal Housing Financial Agency's ("FHFA") removal structure, which also prohibited the president from removing the FHFA Director except "for cause." *Collins*, 141 S. Ct. at 1770, 1783; 12 U.S.C. § 4512(b)(2). A "straightforward application" of *Seila Law* led the Court to the conclusion that

the restriction on the president's authority to remove the FHFA Director was also a violation of the separation of powers principle.  141 S. Ct. at 1784.  In both cases, the Court remanded for lower courts to determine whether the unconstitutional provisions resulted in "compensable harm."  *Collins*, 141 S. Ct. at 1789; *see also Seila Law*, 140 S. Ct. at 2211.

Before the court can address the merits of Melia's constitutional argument, the court has an obligation to ensure its jurisdiction.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Regardless of whether the parties assert or have disclaimed the issue, the court must ensure the parties have standing to raise an issue.  *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019).  To have standing, a plaintiff must show that he has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations omitted). An "injury in fact" must be more than an abstract asserted harm and must be an "invasion of a legally protected interest" that is: (i) concrete; (ii) particularized; and (iii) actual or imminent. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 540 U.S. at 560).

Melia has failed to establish "an injury in fact" arising from Commissioner Saul's work while he was subject to an allegedly unconstitutional removal statute.  Melia primarily argues that the separation of powers violation itself establishes sufficient harm to warrant relief, because the Commissioner therefore acted without constitutional authority, which invalidated the regulations promulgated by the Commissioner and the authority of the ALJ and Appeals Council to act on Melia's claim.  But that argument is foreclosed by *Collins*.  141 S. Ct. at 1788 n.23 ("[T]he unlawfulness of the removal provision does not strip the [Commissioner] of the power to undertake the other responsibilities of his office.").  And, importantly, Melia has not argued in what way these issues affected the decision in *his* claim.

23

Melia's only other argument for establishing an injury in fact is that the President's language in the notice terminating Saul as SSA Commissioner suggested that President Biden disapproved of his policy changes and that the President would have terminated Saul sooner but for the unconstitutional removal restriction.  For one, the statements to which Melia refers were not made by the President but by unnamed White House officials.  ECF Doc. 6 at 12 n.4 (citing https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner (last visited October 14, 2022)).  And, again, Melia has not articulated in what way the President's alleged statements made it more or less likely that his disability claim would have been approved.  *See Colbert v. Comm'r of SSA*, No. 5:20-CV-2234, 2022 U.S. Dist. LEXIS 32920, at *5 (N.D. Ohio Feb. 23, 2022) (rejecting an identical argument).

Absent some argument demonstrating a personal connection between the Commissioner's allegedly improper exercise of authority and the decision on his claim, Melia asks this court to base its jurisdiction on a generalized grievance.  This has long been insufficient to establish standing.  *See Lujan*, 504 U.S. at 560 n.1 (holding that for an injury to be "particularized" the complained of conduct must have affected the plaintiff "in a personal and individual way"); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (holding that harm that affected the plaintiff and every citizen's interest in the proper application of the Constitution and laws, and relief that did not tangibly benefit him more than other citizens was not a case or controversy).

Because Melia has not alleged a particularized injury stemming from the asserted separation of powers violation, he has failed to meet his burden of establishing standing.  *Va. House of Delegates*, 139 S. Ct. at 1950.  And the court cannot, therefore, consider the merits of his constitutional challenge to the SSA.

24

Notwithstanding Melia's lack of standing, his constitutional challenge would nevertheless fail on the merits.  The removal provision Melia argues is unconstitutional is severable from the remainder of the SSA's governing statues, because the SSA would remain fully functional if the offending removal provision were stricken.  *Fauvie v. Comm'r of Soc. Sec.*, No. 4:20-cv-2750, 2022 U.S. Dist. LEXIS 122213, at *7–8 (N.D. Ohio July 11, 2022) (collecting cases).  Any constitutional infirmity in the removal statute would not render Saul's appointment invalid or, by necessity, make void the decisions of the ALJ and the Appeals Council.  *Id.* at *8-9.  Courts have routinely rejected the argument that the ALJ or Appeals Council acted without authority because the offending removal statute deprived Saul of authority to delegate.  *Id.* at *10 (collecting cases).  And, for the same reasons Melia has not established standing, Melia also has not shown "a link between the removal provision and [his] case" such that the harm is "particularized to [him]" in order to establish compensable harm.  *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022); *see also Calcutt v. Fed. Deposit Ins. Corp.*, No. 20-4303, 2022 U.S. App. LEXIS 15979, at *41–42, 44 (6th Cir. June 10, 2022) (unreported).

"[C]ourts across the country have uniformly concluded that the allegedly unconstitutional nature of § 902(a)(3) does not require a remand."  *Fauvie*, No. 4:20-cv-2750, 2022 U.S. Dist. LEXIS 122213, at *11 (quoting *Bryan L. v. Comm'r of Soc. Sec.*, No. 2:21-cv-2835, 2022 U.S. Dist. LEXIS 31392, at *19 (S.D. Ohio Feb. 23, 2022)).  Melia has not pointed to any authority holding otherwise.  Nor has he shown a basis for why his case should be the exception.  Thus, I recommend that the court find that Melia's constitutional challenge presents no basis to remand.

## C.    Step Four: Subjective Symptom Complaints

Melia contends that the ALJ failed to properly evaluate his subjective symptom complaints, which he argues were consistent with his own testimony, the reports of his mother

and fiancé, and the treatment records.  ECF Doc. 6 at 20-24.  He argues that the ALJ also failed

to adequately explain why he found Melia's complaints inconsistent, which resulted in a harmful

error.  ECF Doc. 6 at 23-24.  The Commissioner disagrees.  ECF Doc. 8 at 19-21.  Melia did not

address this argument in his reply brief.  *See* ECF Doc. 9.

A claimant's subjective symptom complaints are among the evidence that an ALJ must

consider in assessing a claimant's RFC at Step Four of the sequential evaluation process.  *See* 20

C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)

("Subjective complaints of pain or other symptoms may support a claim of disability.").

Generally, an ALJ must explain whether he finds the claimant's subjective complaints consistent

with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR

LEXIS 4, at *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ

must clearly explain his reasons for discounting subjective complaints).  In conducting this

analysis, the ALJ may consider several factors, including claimant's efforts to alleviate his

symptoms, whether any treatment was effective, and any other factors concerning the claimant's

functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R.

§§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460,

462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-

to-day activities in determining whether his testimony regarding his pain was credible).  The

regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to

acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v.*

*Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically

each [factor], so long as he acknowledged and examined those [factors] before discounting a

claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727,

26

733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ applied the proper legal standards and reached a decision supported by substantial evidence in finding that Melia's subjective symptoms complaints were inconsistent with the record evidence.  *See* 42 U.S.C. §405(g); *Rogers*, 486 F.3d at 241.  The ALJ acknowledged his obligation to consider the factors delineated in SSR 16-3p. (Tr. 18).  And he identified inconsistencies between Melia's testimony and self-reported functional abilities and the other record evidence.  (*See* Tr. 19-21).  The ALJ discounted Melia's subjective symptom complaints based on inconsistencies between: (i) Melia's treatment history for facial nerve pain and his alleged debilitating limitations, noting that the majority of Melia's pain treatment came from his psychiatrist, and he did not follow-up after his two pain management appointments; (ii) Melia's treatment records did not show a consistent treatment history targeted at his facial pain, noting his depression and anxiety were secondary to his pain; (iii) Melia received conservative mental health treatment compared to his alleged symptoms; and (iv) Dr. Alamir's observations were not consistent with poorly controlled depression or anxiety symptoms. (Tr. 19-21).  The ALJ found that these, taken together, undermined the consistency between the treatment record and Melia's complaints.  (*See id.*).  From this discussion, the ALJ's discussion of such inconsistencies built a logical bridge between the evidence and his conclusion that Melia's complaints were inconsistent.  SSR 16-3p, 2016 SSR LEXIS 4, at*15; *Felisky*, 35 F.3d at 1036.

Moreover, the ALJ's conclusion was supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (i) that Melia submitted only 3 treatment records *not* from Dr. Alamir or his physician assistant, (*see* Tr. 335, 338, 346);

27

(ii) Melia's reports that his depression and anxiety were secondary to his facial nerve damage and, generally, controlled, (Tr. 306, 309, 312, 315, 317, 319-320, 410, 412, 486); (iii) a lack of procedural or other substantial treatment, apart from medication; and (iv) Dr. Alamir's and Lemmon's observations noted mild to moderate symptoms, (Tr. 306, 309, 312, 315, 317, 319-320, 410, 412, 486, 490). *See Biestek*, 139 S. Ct. at 1154.

Accordingly, because the ALJ's findings were supported by substantial evidence, they fell within the Commissioner's "zone of choice." *See Mullen*, 800 F.2d at 545. I recommend that the Commissioner's decision be affirmed on this portion of Melia's arguments.

### D.    Step Four: Medical Opinion

Melia contends that the ALJ erred in finding Dr. Alamir's opinion unpersuasive and failed to provide sufficient explanation for rejecting the state agency psychiatrists' findings that he needed a solitary work setting. ECF Doc. 6 at 14-19. He argues that the ALJ failed to adequately explain his findings, which conflicted with Melia's clinical presentation and daily activities, and were supported by treatment notes that indicated he had anxiety, a short attention span, and was easily distracted. ECF Doc. 6 at 14-18. As to the state agency psychologists, he asserts that the ALJ failed to cite any evidence in support of his rejection of the consultants' opinion that he needed a solitary setting. ECF Doc. 6 at 18-19.

The Commissioner disagrees, contending that Dr. Alamir's opinion was a check-box form and, thus, the ALJ did not err in finding it unsupported and inconsistent. ECF Doc. 8 at 17-19. The Commissioner, however, did not address the sufficiency of the ALJ's evaluation of the state agency psychiatrists' opinions. *See* ECF Doc. 8 at 16-19. Melia's reply brief reiterates his arguments. ECF Doc. 9 at 1-2.

At Step Four of SSA's sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[3]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied the proper legal standards and reached a decision supported by substantial evidence in finding Dr. Alamir's and Lemmon's opinion unpersuasive and in finding the state agency psychiatrists' opinion on the need for a solitary work setting unpersuasive. *See* 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. As to Dr. Alamir and Lemmon, the ALJ met his obligations under 20 C.F.R. § 416.920c(c) by identifying and discussing the factors and evidence supporting the opinion and any inconsistencies with other medical evidence. (*See* Tr. 22). Specifically, the ALJ stated that "Dr. Alamir did not provide any narrative explanation for [the Mental Impairment Questionnaire] ratings suggestive of debilitating mental functioning, including no supporting objective findings or references to the treatment record." *Id.* Because

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

this discusses the internal support Dr. Alamir and Lemmon provided for the opinion, it goes to the supportability factor.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).  Although the ALJ did not specifically identify a "supportability" prong of his analysis, this court does not require the use of buzzwords but reads the decision with common sense.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").  Moreover, the ALJ noted that Dr. Alamir's proposed limitations were inconsistent with his own progress notes, other clinical notes, and Melia's daily activities, such as his progress with the master's degree program.  (*See* Tr. 22).  With a common-sense reading, it is clear from the ALJ's discussion of the lack of explanation and objective findings identified in support of Dr. Alamir's proposed limitations that the ALJ considered the supportability and inconsistency factors and found the Dr. Alamir and Lemmon opinions wanting.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Moreover, substantial evidence supports the ALJ's decision to find Dr. Alamir's and Lemmon's opinion unpersuasive.  *See* 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (i) the lack of any narrative explanation or reference to objective findings or other treatment records in Dr. Alamir's and Lemmon's opinion, (*see* Tr. 488-489); (ii) Dr. Alamir's and Lemmon's treatment records which identified only moderate depression and anxiety levels, (Tr. 306, 309, 312, 315, 317, 319-333, 410, 412, 486, 490); (iii) Dr. Alamir's and Lemmon's consistent treatment of Melia's conditions with medication and minimal adjustments to those medication, (Tr. 306, 309, 312, 315, 317, 319-333, 410, 412, 486, 490); (iv) Melia's successful (though challenging) participation in a master's degree program, (Tr. 44-47); and (v) Melia's normal cognitive functioning and his ability to engage in daily

activities, such as handling his finances and shopping, which were noted by him, his mother, and his fiancé, (Tr. 249, 283-284, 289-291).  *See Biestek*, 139 S. Ct. at 1154.

Even if the ALJ had erred, however, the error would be harmless because the Mental Impairment Questionnaire did not include any narrative or explanatory descriptions of Melia's conditions, and constituted only a check-box form.  *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) (holding that a check-box form was patently deficient due to the lack of explanation provided with it).  Any error in the ALJ's analysis would, thus, have been harmless because the opinion itself was patently deficient.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).[4]

As to the state agency psychiatrists' opinions, Melia only contests the ALJ's rejection of the proposed need for a solitary work setting.  *See* ECF Doc. 6 at 18-19.  Melia in part, argues that the ALJ's discussion was flawed due to the lack of citations to the medical record.  However, the ALJ was not required to provide citations and found that Melia got along with his treatment providers and that there was a lack of evidence of any altercations or problems with his community or others generally.  (Tr. 22).  Further, the ALJ's findings were supported elsewhere in the decision where the ALJ summarized the treatment records from the medical evidence, including citations to those documents.  (*See* Tr. 19-20).  Although the ALJ did not specifically note Melia's interactions with the treatment providers in summarizing each of these notes for the objective medical evidence, the ALJ's discussion demonstrates that he read and considered those

---

[4] While the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations.  *See Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 U.S. Dist. LEXIS 215187, at *14 n.5 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 U.S. Dist. LEXIS 134907, at *33 n.8 (W.D. Tenn. July 20, 2021); *Burba v. Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 U.S. Dist. LEXIS 179252, at *11-12 (N.D. Ohio Sept. 29, 2020).

records, from which he could reasonably conclude that Melia got along well with the treatment providers.  *See Fleischer*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011); *accord Shrader*, 2012 U.S. Dist. LEXIS 157595, at *16.  Because the court reads the record as a whole, the fact that the ALJ's citations to the evidence were not in the same paragraph as his discussion of the state agency psychiatrists' opinions, is not an error.  *See Buckhanon ex rel. J.H.*, 368 F. App'x. at 678-79.

Substantial evidence supports the ALJ's finding that the state agency psychiatrists' findings were inconsistent.  *See* 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Specifically, Dr. Alamir's and Lemmon's treatment notes, as summarized above, routinely indicated that Melia was friendly, participated in the sessions and was cooperative.  Moreover, the ALJ relied on the *lack* of any evidence demonstrating that Melia had angry outbursts, mood fluctuations, or had difficulties working or living with others.  *See Biestek*, 139 S. Ct. at 1154.  The ALJ cannot be faulted for not citing the record regarding a lack of evidence on various points; one cannot cite evidence that does not exist.  Although Melia contests the ALJ's finding that there was a lack of evidence showing Melia's difficulties with others, Melia has not pointed to substantial evidence that would support the opposite conclusion.  Even if he had, the fact that evidence supports both sides does not undermine the substantial evidence that otherwise supported the ALJ's finding.  *See O'Brien*, 819 F. App'x at 416.

Accordingly, the ALJ applied the proper legal standards and reached decisions supported by substantial evidence in evaluating Dr. Alamir's and the state agency psychiatrists' opinions.  I recommend that the ALJ's decision be affirmed.

IV.     **Recommendation**

Because Melia's constitutional challenge cannot succeed and because the ALJ applied

proper legal standards and reached a decision supported by substantial evidence, I recommend

that the Commissioner's final decision denying Melia's applications for DIB and SSI be

affirmed.

Dated: November 18, 2022

Thomas M. Parker
United States Magistrate Judge

_____

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report & recommendation, a party may
serve and file specific written objections to the proposed findings and recommendations of the
magistrate judge.  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).
Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the
right to raise the issue on appeal either to the district judge or in a subsequent appeal to the
United States Court of Appeals, depending on how or whether the party responds to the report
and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be
specific and not merely indicate a general objection to the entirety of the report and
recommendation; "a general objection has the same effect as would a failure to object." *Howard
v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus
on specific concerns and not merely restate the arguments in briefs submitted to the magistrate
judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge
without specific objections 'wastes judicial resources rather than saving them, and runs contrary
to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL
301875, at \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific
objections may in rare cases be excused in the interest of justice.  *See United States v.
Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).